**UNITED STATES of America,**
Appellee,

v.

**Ugo ROSSI, Defendant-Appellant; Jean Laget, Henry Sauzet, Andrew Alberti and John Doe, Defendants.**

**No. 141, Docket 23097.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 6, 1955.

Decided Feb. 18, 1955.

Charles J. Margiotti, Pittsburgh, Pa., Benjamin Kronenberg and Lionel Golub, New York City, for defendant-appellant.

J. Edward Lumbard, U. S. Atty. for the Southern Dist. of N. Y., New York City (Lawrence U. Costiglio and George H. Bailey, New York City, of counsel), for appellee.

Before SWAN and MEDINA, Circuit Judges, and DIMOCK, District Judge.

MEDINA, Circuit Judge.

Defendant Ugo Rossi appeals claiming that the evidence is insufficient to support his conviction of conspiracy in connection with the transportation and sale of narcotics, and of wilful participation in a particular transaction which occurred in the City of New York on April 23, 1953. Others errors are assigned which we shall discuss to the extent deemed necessary.

As a result of many years of patient preparation a number of government narcotics agents finally got on the trail of some large operators, from whom a number of substantial purchases were made by the government agents. On April 23, 1953, the defendant Jean Laget, who subsequently pleaded guilty and has been sentenced to ten years imprisonment by the judge who presided over this trial, was in his automobile with one of the government agents, who was about to make another purchase consisting of one kilo of heroin for $6,500. Laget, proceeding by a circuitous route, arrived at Ninth Avenue and 15th Street, he then circled the block and again approached Ninth Avenue and 15th Street. He was evidently waiting for the arrival at this intersection of the person from whom he was to take delivery of the heroin, and presently he said, "There he is now," as a green De-Soto car bearing license number QC5689, whose sole occupant was the driver, pulled up near a gasoline station on the west side of Ninth Avenue between 14th and 15th Streets. Laget parked his car, went over to the DeSoto, was seen to open the door, lean in and to return to his car with the package containing the

heroin. He then delivered the package to the government agent, received the $6,500 and was promptly taken into custody.

The government produced a number of witnesses, each of whom added his bit to the over-all mass of circumstantial evidence, which the government claims justified a finding by the jury that the man driving the DeSoto was Rossi and that Rossi had delivered the package of heroin to Laget when he leaned in through the door of the car. There were a number of government agents in the immediate vicinity and the identification of Rossi was quite sufficient to support the verdict. While no one had searched Laget before he went over to the DeSoto car, he had been with the supposed purchaser for some little time and could not readily have concealed a package such as the one later delivered, which contained a kilo of heroin and was 16 or 17 inches long and 2 or 3 inches thick. Moreover, Rossi had been seen with Laget prior to this occasion and at the very residence of Rossi, 128 St. Marks Place, where, an hour or less after the incident above described, Rossi was found in front of the house sitting in the same automobile, bearing the same license number. The arguments advanced before us on this appeal do not touch the sufficiency of the proofs but only the weight to be given to the various conflicting factors by the triers of the facts. The courts have held again and again in the narcotics cases that it is not necessary for the government to produce a witness who saw the package containing narcotics handed over. See United States v. Pisano, 7 Cir., 1951, 193 F.2d 355, 31 A.L.R.2d 409; United States v. Parker, 2 Cir., 1954, 217 F.2d 672. Otherwise it would never be possible to convict those who participate in this despicable business, each of whom is continually on the alert against the possibility of detection and apprehension. Here the evidence far exceeded the minimum required by the application of the rule of circumstantial evidence and the instructions of the trial court on the subject were if anything too favorable to defendant,[1] whose defense was alibi.

The contention is advanced that defendant was prejudiced by cross-examination which revealed perjurious statements in his applications for an immigration visa and for naturalization and also by receiving in evidence admittedly accurate translations of certified copies of records of convictions of various crimes in Italy. As to the records of prior convictions, it is asserted that they are too remote to have any substantial relevancy to the issue of defendant's credibility as a witness in his own defense, and that defendant's denials that the records could have any reference to him was sufficient to exclude them, in the absence of some further identification by way of finger prints, photographs or the like. The trial court left the question of identification to the jury with an instruction that they were not to consider this evidence as bearing on defendant's credibility unless and until they first were convinced that the records referred to defendant. A scrutiny of the record discloses that these claims are wholly without merit.

At the outset of defendant's direct examination his counsel, after bringing out the fact that defendant was born in Palermo, Sicily, proceeded to question

---

1. Having covered the law applicable to circumstantial evidence in his main charge, the trial judge added the following, at the request of counsel for defendant, "Circumstantial evidence tending to connect the defendant with the offense charged against him cannot be considered against the defendant unless it points unerringly and unmistakably to the defendant's guilt and excludes any inference of his innocence." See United States v. Simone, 2 Cir., 1953, 205 F.2d 480; United States v. Austin-Bagley Corp., 2 Cir., 1929, 31 F.2d 229, certiorari denied, 1929, 279 U.S. 863, 49 S.Ct. 479, 73 L.Ed. 1002; McGuinn v. United States, 89 U.S.App.D.C. 197, 191 F.2d 477, 479; Himmelfarb v. United States, 9 Cir., 1949, 175 F.2d 924, 942, certiorari denied, 1949, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527.

him at some length concerning his conviction "of some offense or crime in Italy." This, defendant, with some gusto, described as a conviction in 1926 for "a conspiracy against the fascist regime," and he stated that he was in prison for five years, after which he was taken to the island of "Lambdusa," from which he escaped and came to America. The implication was that he had never been convicted of any other crime and this he vigorously asserted without qualification in his later testimony. It is not clear what was the purpose of opening up this subject but we may assume that it was thought it would help him with the jury, because he said he opposed Mussolini and the fascists, or that he wished to anticipate some cross-examination as to the part of his life spent in jail.

The cross-examination brought out that defendant was born in Palermo on December 10, 1901, and that his father was Roberto and his mother Mathilde. Government counsel turned to the subject of defendant's application at Montreal, Canada, for an immigration visa. This elicited a barrage of objections on the ground that "we are not trying an immigration case here." But the document was received, defendant identified his signature, and it appeared that, despite his testimony on direct examination to the five years spent in prison in Italy, he had sworn in his visa application "that I have never been in prison." His petition for naturalization was then produced, identified and received in evidence, over objection, and, in answer to Question 24, he had sworn that neither in the United States nor in any other country had he ever been arrested, summoned into court as a defendant or "convicted, fined, imprisoned, or placed on probation" for any felony, misdemeanor or other breach of law or ordinance. He could only explain by blaming his lawyer and insisting that "in my conscience I felt that I had not committed any crime."

It is against this background that government counsel produced the sheaf of prior convictions in Italy running from petty theft to complicity in premeditated homicide, which turned out to be the crime he had euphemistically described as "a conspiracy against the fascist regime." The certified copies of the records were in Italian and the translations were filled, as they often are, with quaint expressions and unfamiliar words such as one trained in the use of a foreign language might use. But the meanings are in all cases clear, especially in the light of the extended descriptions of what those charged with crime in Palermo had actually done.

The story of defendant's long list of experiences with the criminal courts in Sicily begins on the night of March 25, 1919, when he and two of his friends were stealing chickens. Ugo Rossi, described in the record as "son of the late Roberto, 17 years of age from Palermo," was found "guilty of doubly qualified theft due to the number of persons and climbing," and sentenced to one year of "continuous cellular segregation," the execution of which sentence was suspended for five years by the Court of Appeals of the District of Palermo, 3rd Penal Section, because of his "minor age" and "good penal precedents." The significance of this, in view of the assurance with which counsel insist that these records of convictions relate to some entirely different Ugo Rossi, is that defendant on redirect examination let it slip out that "two or three years before" 1919, "12 or 13 boys" including himself went out to a farm in the country and "one of those fellows took one chicken," which was "cooked and eaten, and it was not enough for the entire group." He was sure that he was not brought to any court but the boys were taken to the station house and given a talking to.

The facts are all set forth with meticulous care in the Italian records. It seems that young Rossi had two friends, LaRosa and Caracappa. After stealing, not one chicken but enough to fill a sack, LaRosa went ahead carrying the sack and the others followed behind. Unfortunately the patrol came along, appre-

hended LaRosa with the sack full of "the stolen hens," he confessed at the police station, implicated the other two and they all wound up in jail.

On the 6th of June, 1919, Ugo Rossi and a number of other friends broke into the home of Chiarina Fernandez and stole a number of miscellaneous articles of personal property. In some way Giuseppe Moscato, "a gentleman with a spotless record" became involved, as some of the stolen property found its way into the possession of Moscato and his "lover," Natalina Polimena. As a "gentleman" was involved considerable delay seems to have ensued, but on May 3, 1920, all were convicted, including Moscato and Polimena, and Ugo Rossi was sentenced to two years and six months. He is described as "son of Roberto, 17 years of age, from Palermo." But, perhaps because Moscato was "a gentleman of spotless record," a royal pardon suddenly appeared and Moscato and Polimena got off; the ultimate fate of the others is uncertain.

The next record of conviction naturally leads up to the murder story in the last chapter. Just after midnight on January 17–18, 1925, there was a brawl in a restaurant. The lurid details appear fully in the record. Several men were stabbed, but all recovered. The accused, including Ugo Rossi, now described as "son of the late Roberto, 23 years of age, from Palermo," were identified by the victims on the night of the scuffle, but in some way which did not seem strange to the criminal authorities in Sicily, there was a curious reluctance to identify Ugo Rossi at the trial. The owner of the restaurant while recognizing Rossi as "an habitual adventurer," couldn't seem to remember that he was in the restaurant that night. But the judges discounted all this and found Rossi guilty and the accused were all sentenced "to imprisonment for eight months and four days, with the increase of one-sixth of the duration of the continuous cellular segregation" in the cases of Rossi and one other. This was re-duced on appeal to four months. All the jury heard about this knifing in the restaurant was that Rossi had been convicted of "complicity corresponding to lesions with weapons."

The final conviction is the one defendant's counsel insisted on bringing into the case as a five-year jail sentence "for conspiracy against the fascist regime." It turned out to be in 1929, rather than 1926, there were twenty defendants instead of the two hundred claimed by defendant, nine of them were acquitted and the others, including Ugo Rossi, "son of the late Roberto and son of Mathilde Patorno, born at Palermo, December 10, 1901;" were given long prison sentences, depending on the leadership, the firing of the fatal shots and so forth. Two men had been shot to death and another recovered. The crime for which Rossi was convicted is described as "complicity in qualified homicide."

■ It was clearly proper to probe into the perjurious statements in defendant's visa and naturalization applications; and there is more than sufficient proof to warrant a finding that the defendant and the Ugo Rossi described in the various records were one and the same person. Moreover, his reliance upon our recent decision in United States v. Provoo, 2 Cir., 1954, 215 F.2d 531, is misplaced. The very theory of completeness which is discussed in the Provoo case would make proper an inquiry into the whole subject of defendant's convictions of crime in Italy, in view of his opening up that subject on direct examination.

■ Nor is there any merit in the claim that the trial judge improperly interfered with the conduct and progress of the trial. What he did would have been well within his powers in any event, but it was absolutely essential in this case, in view of the nature of many of counsel's objections and the general atmosphere of confusion which some of the participants in the trial, and especially the defendant himself, seemed quite

adept at creating and spreading. We see no occasion for discussion of defendant's other points.

Affirmed.